J. Brodie & Son, Inc. v. Commissioner.
J. Brodie & Son v. Commissioner
Docket No. 16425.
United States Tax Court
1949 Tax Ct. Memo LEXIS 223; 8 T.C.M. (CCH) 319; T.C.M. (RIA) 49082; March 30, 1949
*223 On the record, held, payments made by petitioner in the taxable years involved, as compensation for services, to its two executives were reasonable in amount and are deductible in full under section 23(a)(1)(A) of the Internal Revenue Code. Benjamin E. Jaffe, Esq., Fisher Bldg., Detroit, Mich., W. F. Robinson, Esq., and R. M. O'Hara, Esq., for the petitioner. Cecil H. Haas, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves a deficiency in income tax for the calendar year 1941 in the amount of $1,489.12, and deficiencies in excess-profits taxes for the years 1941 and 1942 in the respective amounts of $3,807.35 and $13,994.16. The only issue submitted is the reasonableness of the compensation paid by petitioner to its two principal officers in the respective taxable periods. The case was submitted upon oral testimony and exhibits. Findings of Fact Petitioner is a Michigan corporation, organized in 1933 and having its principal place of business at Detroit, Michigan. Its tax returns for the periods involved were filed with the collector of internal revenue for the district *224 of Michigan, at Detroit, Michigan. Petitioner is engaged principally in the ventilating and air conditioning business. It also carries on a general sheet metal business and has a department devoted to the manufacture and installation of fire doors. Petitioner's issued and outstanding stock consists of 1,140 shares of common stock at the par value of $10 per share, and, since 1937, has been owned and held as follows: Anna Brodie
140 shares
Elizabeth Brodie
621 shares
Arnold N. Brodie
275 shares
Lee Brodie
18 shares
Eleanor Brodie
18 shares
Edith Brodie
68 shares Elizabeth Brodie is the wife of Aaron H. Brodie, Anna Brodie is his mother, Lee, Eleanor and Edith Brodie are his sisters, and Arnold is his brother. Petitioner's board of directors consists of Aaron H. Brodie, president, Arnold N. Brodie, secretary, and Elizabeth Brodie, wife of Aaron. In about 1916 Julius Brodie, the father of Aaron and Arnold, founded a general sheet metal business and also manufactured and installed fire doors. Aaron became associated with his father in about 1919. In 1928 they conducted the business as a copartnership and so continued until the father's death in 1931. Arnold *225 became associated with the business as an employee in about 1924. Upon the organization of petitioner in 1933, it took over the business and assets of the former partnership. In 1911 Aaron Brodie received a degree in civil engineering. After graduation he held several positions in the engineering field. In 1916 he was engaged as a structural engineer with Smith-Hinchman & Grylls, then one of the largest architectural firms in the United States. In 1917 he enlisted in the Navy and took charge of construction work at the Great Lakes Station. After receiving his discharge in 1919, he went to work with his father. At that time there were no firms in the City of Detroit capable of handling ventilation contracts of any size or importance. Believing there were opportunities for specializing in that type of work, Aaron contacted various architects with a view to persuading them to draw separate ventilation specifications in their larger contracts. In 1921 he began submitting bids for ventilation work. Arnold N. Brodie became associated with the business in 1924, doing general office work and performing duties of a routine nature. He was instructed by his brother Aaron in the making of *226 estimates, and after eight or nine years became proficient in estimating and supervising the work carried on by petitioner, and thereafter performed the same functions as his brother. The ventilation system for a large building consists of an equipment room and a distribution system. The equipment room contains fans, motors, filters, heating coils, cooling coils and a complete metal housing which carries the air from the outside through the various pieces of equipment in to the distribution system. This part of the ventilation contracts was sublet by petitioner. The distribution system consists of an intricate system of sheet metal ducts throughout the entire building, with outlets or registers in each room. Petitioner manufactures these ducts and furnishes all the labor in their construction and installation. Practically all of petitioner's ventilating contracts were obtained through competitive bidding, which required careful and accurate estimations of labor and material costs. After a contract was awarded, it was the practice to have one of the brothers personally supervise the installation, make the necessary "shop drawing" to meet the problem of interference where conduits, *227 pipes and other lines blocked the course of the ventilating ducts; and prepare the monthly progress reports for the purpose of obtaining the architect's certificate to procure from the owner moneys for the work as it progressed. During the taxable years 1941 and 1942 petitioner had approximately 150 employees, with a payroll of approximately $15,000 a week. Other than direct labor employees, petitioner employed only one office employee, who took care of the routine office work. Petitioner had no one in its employ who could be separately classified as a salesman, a contact man, an engineer, an estimator or general superintendent. All such functions were performed by the two brothers, Aaron and Arnold Brodie. All the foremen employed were hourly-rated employees who were personally selected and instructed as to the details of each job by the Brodies. During the taxable years involved, the two Brodies worked six days a week from 8:30 A.M. to 5:00 or 6:00 P.M. They also worked three or four evenings a week, and often worked on Sundays in preparation of specifications and estimates. Except for a three-week vacation taken by Aaron under the doctor's orders in 1942, neither brother took *228 any time off for a vacation in the taxable years involved. Prior to the war most of petitioner's ventilating contracts were in connection with commercial type buildings. In about 1941 the larger plants and factories began installing what are sometimes called "living quarters" for their employees. Such quarters included rest rooms, locker rooms and other facilities for the convenience and recreation of employees. Such facilities were ventilated, creating a tremendous new field. Much of the work performed in 1941 and 1942 was in connection with war plants, and was required to be performed under pressure of time. Since time was of the essence, the Brodie brothers were required to keep in close contract with the job to expedite deliveries of the necessary equipment and material. Because of restrictions placed upon the use of sheet metal during the war years, petitioner was required to substitute fabricated materials, which were less pliable than sheet metal. In order to make the fabricated material ducts airtight, Aaron Brodie conceived the idea of fabricating two types of metal cleats which proved successful in preventing leakage of air when under pressure. During the taxable year 1942, *229 petitioner was required to obtain priority rating from the War Production Board. The following table shows petitioner's gross sales, net income or loss before taxes, capital and surplus and officers' salaries paid for the period 1935 to 1942, inclusive: Capital and
Officers'
Year
Gross Sales
Net Income
Surplus
Salaries
1935
$ 47,747.52
$ 204.26
$ 801.75
$ 6,370.00
1936
113,640.76
7,021.13
6,268.64
15,451.66
1937
200,923.85
1,194.41
11,912.49
14,800.00
1938
71,823.16
1,543.18
12,977.77
7,800.00
1939
201,904.38
(5.77)
12,972.00
12,300.00
1940
171,364.95
1,830.28
14,800.13
22,800.00
1941
465,512.79
24,311.95
27,598.90
40,000.00
1942
754,371.38
40,794.14
35,503.51
46,500.00
Dividends were declared and paid in the years 1936, 1937, 1938, 1941 and 1942. The issued and outstanding capital stock in each of the years 1937 to 1942, inclusive, was $11,400. The following table shows the amounts paid by petitioner to its two executive officers, the amounts allowed by the respondent, and the amounts disallowed in the taxable years involved. Amount
Amount
Year
Officer
Amount Paid
Allowed
Disallowed
1941
Aaron H. Brodie
$24,000.00
$18,000.00
$ 6,000.00
Arnold N. Brodie
16,000.00
12,000.00
4,000.00
Totals
$40,000.00
$30,000.00
$10,000.00
1942
Aaron H. Brodie
$28,500.00
$21,000.00
$ 7,500.00
Arnold N. Brodie
18,000.00
15,000.00
3,000.00
Totals
$46,500.00
$36,000.00
$10,500.00
*230 The salaries were fixed at informal meetings held by the petitioner's board of directors. Minutes of these informal meetings were later typed and incorporated in the minute book. In the taxable years 1941 and 1942 the resolutions fixing the officers' salaries provided that all entertainment and new business expenses incurred by the officers were to be paid from their fixed salaries. In each of the taxable years 1941 and 1942 Aaron H. Brodie spent approximately $2,000 and Arnold N. Brodie spent approximately $1,000 for entertainment and new business expenses, which amounts were paid by them out of their individual funds. The amounts paid by petitioner as compensation to Aaron H. Brodie of $24,000 and to Arnold N. Brodie of $16,000, for services rendered in the taxable year 1941, and the amounts paid by petitioner as compensation to Aaron H. Brodie of $28,500, and to Arnold N. Brodie of $18,000, for services rendered in the taxable year 1942, were reasonable. Opinion The sole issue presented is the reasonableness of the compensation paid by petitioner to its two chief executives for services rendered in the respective taxable years involved. Petitioner has the burden of establishing *231 the fact of reasonableness. Petitioner's capital structure was small, and the success it enjoyed was primarily due to the personal services rendered by its two principal officers - Aaron and Arnold Brodie. They were both efficient and competent engineers, thoroughly trained in designing and installing ventilation equipment, in which industry they were pioneers. In addition to their duties as the sole executives, they drafted specifications and prepared the estimates of the cost of labor and materials for submitting bids. They purchased the materials and personally supervised the work of installation, rather than delegating the mechanical and supervisory duties to employees. The performance of such additional duties required them to devote long hours of hard work and to forego vacation periods. The personal contact with all phases of the business and the satisfactory manner in which they carried out their contracts established for petitioner a reputation in the industry which materially contributed to their increased business. The salaries authorized by the board of directors were not based on stock holdings. The fact that their salaries were increased with petitioner's increase *232 in earnings does not, we think, establish that profits were being distributed in the guise of salaries. The fact that during the taxable years in question the increased business was somewhat related to war conditions then existing is a factor to be considered. Since, however, petitioner's earnings were the result of personal services, the increased business imposed additional work and correspondingly increased the responsibilities of these executives; the requirement of securing priorities and the necessity of adopting substitutes for scarce materials also entailed added responsibilities. Petitioner offered the testimony of four reputable and distinterested witnesses who were engaged in the structural industry in the same locality. All of these men were well acquainted with the character and quality of the services rendered to the petitioner by Aaron and Arnold Brodie. Three of them expressed the opinion that the compensation received by these two executives was reasonable. The respondent offered no witnesses in support of the amounts he had allowed as reasonable compensation. We were favorably impressed by the expert testimony offered by petitioner and, since the credibility of *233 such testimony was not impeached, under the present circumstances it can not be ignored. Wright-Bernet, Inc. v. Commissioner, 172 Fed. (2d) 343 (decided February 4, 1949); Roth Office Equipment Co. v. Gallagher, 172 Fed. (2d) 452 (decided February 10, 1949). We hold that petitioner has sustained its burden of establishing the reasonableness of the amounts paid to its two executives for services rendered in the taxable years involved, and the respective amounts paid are deductible under section 23(a)(1)(A) of the Internal Revenue Code. Since there are other adjustments which are not contested. Decision will be entered under Rule 50.